UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DAVID TALBERT,

                        Petitioner,

-against-

                                              **MEMORANDUM & ORDER**

JAMES T. CONWAY, , Superintendent,                    05 CV 1079

                        Respondent.
-------------------------------------------------------------------X
DEARIE, Chief Judge.

      Petitioner David Talbert was convicted, following a jury trial at which he testified, of murder in the second degree, robbery in the first degree, and criminal possession of a weapon in the second degree. The charges arose out of a 1999 murder of a livery cab driver in Brooklyn, one of eleven that occurred in New York City that year. Petitioner, now in custody on his concurrent sentences of fifteen years for the weapons possession, twenty-five years for the robbery, and twenty-five years to life for the murder, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the application is denied and the petition is dismissed.

## BACKGROUND

      The trial evidence included a videotaped statement petitioner made to authorities after his arrest, testimony from petitioner refuting portions of that statement, and testimony from Christopher Rodriguez, one of petitioner's two accomplices. Ronald Jordan, the other accomplice, did not testify.

      Both Rodriguez and petitioner provided accounts of a day that began with Jordan and

Rodriguez meeting petitioner at his apartment in the Bronx, where a plan was hatched to travel to Brooklyn. At the time, petitioner was 30 years old, Jordan was 19, and Rodriguez only 15.

According to Rodriguez, both the box cutter and the semiautomatic handgun used in the murder later that day were in petitioner's apartment. On their subway ride to Brooklyn, Rodriguez carried the box cutter, while petitioner and Jordan took turns holding the gun. There came a point in Brooklyn when petitioner unloaded the clip from the gun, shined the bullets, and then reloaded the gun. It was petitioner's idea to commit the robbery; the plan originally was to steal the cab itself along with any cash the driver had, and each participant had an assigned role.

Once the plan was in motion and the threesome was in the back seat of the cab, petitioner gave Jordan the signal to point the gun at the driver and shoot. Jordan fired a single shot and then the gun jammed. The driver, still alive, struggled to seize control of the weapon. At that point, at petitioner's instruction, Rodriguez reached for the contents of the driver's pockets and, using the box cutter, stabbed the man in the stomach and then pulled up with it, ripping open his side. Meanwhile, petitioner took the gun from Jordan and struck the driver with it, and after clearing the jam, shot the driver several more times until the car crashed into a wall. The assailants fled, leaving the driver hunched over the wheel. A total of four bullets had entered his head and upper body.

Cross-examination of Rodriguez revealed minor inconsistencies between his trial testimony and his plea allocution. He also testified that, depending on the quality of his testimony, he stood to receive up to a two-year reduction on the minimum end of his sentence of seven years to life. (He was ultimately sentenced to six years to life.) Jordan, who also entered a guilty plea before trial, did not testify. He was sentenced to 17 years to life. Neither Jordan nor

Rodriguez appealed.

At a pre-trial Huntley hearing and again at trial, Detective Charles Johnson testified that he read petitioner his Miranda rights and that petitioner waived them before making any statements. The signed Miranda waiver was admitted at the hearing and at trial. Johnson also testified that while in custody, petitioner ate a sandwich, smoked two cigarettes, and was offered use of the restroom.

In his videotaped statement, petitioner admitted that he was present in the cab during the crime, that he possessed the box cutter, and that he used it to cut the victim. At trial, however, he admitted only that he was present in the cab but denied participating in the crime, claiming that his incriminating statements on the videotape were neither voluntary nor true, but the result of pressure from Johnson. Petitioner claimed that Johnson regarded an earlier written statement as inadequate and threatened him with the death penalty unless he admitted using the box cutter. (The earlier written statement in which petitioner denied any role in the crime was introduced at the suppression hearing but not at trial.) The account petitioner gave at trial was that he knew his friends had a gun and that he heard them discussing a robbery, but that he did not think they would actually carry out their plan. He further testified that he was already starting to leave the cab when Jordan pointed the gun at the driver, and that he then froze while the struggle ensued and the car continued to move.

## DISCUSSION

### The Sixth Amendment Claim

Petitioner's principal claim is based on the fact that he was interrogated in Brooklyn about the livery cab murder after being transported there from the Bronx, where he had been in

custody awaiting arraignment on an unrelated murder charge. He argues that because his Sixth Amendment right to counsel in that Bronx matter had attached, his subsequent Miranda waiver in Brooklyn during his questioning about the Brooklyn murder, in the absence of counsel, was ineffective, and that the admission at trial of the statements he made there violates his Sixth Amendment rights.

The claim lacks merit. While it is true that, "once [the Sixth Amendment] right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective," McNeil v. Wisconsin, 501 U.S. 171, 175 (1991), the Supreme Court has made clear that the Sixth Amendment right is "offense specific." Id. This means that it "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Id. (internal citations omitted). As the Court further explained, "[a]nd just as the right is offense specific, so also its . . . effect of invalidating subsequent waivers in police-initiated interviews is offense specific." Id.

Assuming that petitioner's Sixth Amendment right to counsel had *attached* on the Bronx matter, where he had been arrested on a felony complaint and was awaiting arraignment, that right, under McNeil, plainly did not bar police from questioning petitioner about the unrelated Brooklyn charge. Thus, when rejecting this claim on the merits on petitioner's motion to vacate under C.P.L. §440.10, the state court did not act contrary to or unreasonably apply Supreme

Court law.[1]

Nothing in petitioner's extensive *pro se* submissions suggests that he inadvertently dressed up a meritorious claim with the wrong label. His *separate* Sixth Amendment right to counsel *in the Brooklyn matter* had not yet attached during the time of the Brooklyn interrogation, which preceded the filing of formal charges; petitioner does not dispute the unrelatedness of the Bronx and Brooklyn murder charges; and he does not make or imply a *Fifth* Amendment claim directly challenging the voluntariness of the Miranda waiver and subsequent statements he gave to Brooklyn authorities.[2] What removes any doubt that petitioner's claim is the one foreclosed by McNeil is his exclusive reliance, here and in his 440 motion in state court, on People v. Rogers, 48 N.Y.2d 167 (1979), where the New York Court of Appeals held that, under New York law, "once a defendant is represented by an attorney, the police may not elicit from him any statements . . . even when the interrogation concerns unrelated matters." 48 N.Y.2d at 173. While making the essence of his claim clear, petitioner's reliance on New York law, of course, is of no avail here, where it is the Supreme Court's holdings and the federal constitution that control. See 28 U.S.C. §2254 (a) (writ may be entertained "only on the ground that [petitioner] is in custody in violation of the Constitution or law or treaties of the United States"); Carey v. Musladin, 549 U.S. 70, __, 127 S.Ct. 649, 653 (2006) (habeas relief available

---

[1] See People v. Talbert, No. 8343/99, (Sup. Ct. Kings Co. Nov. 16, 2007), slip. op. ("440 Decision") at 5-6. The Appellate Division denied petitioner's application for leave to appeal the denial of his 440 motion. People v. Talbert, 2008 N.Y. Slip Op. 63716 (2d Dep't Feb. 13, 2008). The Court of Appeals denied leave to appeal the denial of the leave application. People v. Talbert, 10 N.Y.3d 844 (2008).

[2] Although petitioner made voluntariness claims before and during trial, he apparently abandoned any Fifth Amendment claim thereafter, for it is not addressed in his direct appeal, his 440 motion, or his petition.

only if state court decision "was contrary to or involved an unreasonable application of *this* Court's applicable *holdings*") (emphasis added); Williams v Taylor, 529 U.S. 362, 412 (2000) (federal law in section 2254(d) "refers to the *holdings* . . . of *this* Court's decisions") (emphasis added).

In any event, as the 440 court found, petitioner's claim lacks merit even under New York law and the Rogers line of authority. 440 Decision at 5-6. Although petitioner had a right to counsel at his pending arraignment on the Bronx murder charge, he was not yet, in fact, represented,[3] and that distinction is critical for purposes of the Rogers rule: as the New York Court of Appeals explained in People v. Kazmarick, 52 N.Y.2d 322 (1981), a post-Rogers decision relied on by the 440 court, "[a] pending unrelated criminal case upon which an arrest warrant has issued does not bar the police from questioning a suspect when the suspect does not in fact have counsel on the unrelated charge. . . . [t]he unrelated charge is pertinent to the suspect's right to counsel on a new charge only if the suspect is in fact represented by counsel on the unrelated charge." 52 N.Y.2d at 324.

The Playback of Petitioner's Videotaped Statement

The jurors deliberating at petitioner's trial asked for a replay of petitioner's videotaped statement, the court returned them to the courtroom for this purpose and, with the prosecutor and

---

[3] Petitioner's own papers consistently aver that he was "awaiting arraignment in the Bronx." See, e.g., Petitioner's Affidavit in Support of Motion to Vacate Judgment, dated August 2005 at par. 3. He also asserts that New York has a "uniform practice" of assigning attorneys to indigent defendants at or shortly after their arraignment for a felony, and that the District Attorney in Brooklyn had a duty to inquire whether petitioner was represented by counsel on the pending Bronx charge. Petitioner's Memorandum of Law at 29.

defense counsel present, the replay occurred, without incident. Petitioner claims, however, that he was not present during this replay and that his conviction should therefore be overturned because that brief absence deprived him of his constitutional right to be present during all material stages of his trial, and because an error of this caliber is not subject to harmless error review. The state court rejected this claim on the merits, concluding that petitioner had "failed to satisfy his burden of coming forward with substantial evidence to rebut the presumption of regularity which attaches to all criminal proceedings." People v. Talbert, 303 A.D.2d 696 (2d Dep't 2003). This Court does not find that determination to be contrary to or an unreasonable application of Supreme Court law.

It is perplexing, however, that the record does not reveal whether petitioner was, in fact, present during the replay of his confession. What the record does show is the following: (i) when the trial court met with the attorneys to consider a jury note asking to see the Miranda warnings and petitioner's videotaped statement, the court clerk stated, "Defendant's not present before the Court," T. 485; (ii) after the court was told that the Miranda sheet had been sent in to the jury, it ordered the jury returned to the courtroom, T. 485; (iii) with no indication in the transcript of a break in the proceedings, the jury entered the courtroom and the clerk stated, "All parties are present" and "All jurors are present," T. 486; and (iv) the videotape was played. T. 487. On the basis of these excerpts, petitioner insists that he was absent because there is no indication in the transcript, following the clerk's initial announcement that he was not present, that he entered the courtroom before the jury was returned and the tape played; respondent resorts to citing legal dictionaries to establish that "parties" as used in the clerk's final remark denotes the accused and his counsel; and the Appellate Division decided the matter on the basis of a legal presumption.

Apparently overlooked were any of the simple steps that could have eliminated guesswork on the part of a reviewing court, such as an affidavit from someone who remembers whether petitioner was present or a brief reconstruction hearing in the trial court. Indeed, petitioner's alleged absence during the playback was the sole issue raised on petitioner's direct appeal, and both briefs suggested to the Appellate Division that it remand the matter to the trial court for just that purpose.

Even assuming petitioner's absence, however, the claim is not a basis for relief because petitioner has not established that he was deprived of a constitutional right. Although a criminal defendant has the right to be "present at all stages of the trial where his absence might frustrate the fairness of the proceedings," Faretta v. California, 422 U.S. 806, 820 n. 15 (1975) (internal citation omitted), the right is not absolute. Rather, an accused has the right to be present only to the extent that his "presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934), overruled on other grounds, Malloy v. Hogan, 378 U.S. 1 (1964). Cf. Clark v. Stinson, 214 F.3d 315, 323 (2d Cir. 2000) (defendant's absence is "reversible error" only when Snyder standard met), cert. denied, 531 U.S. 1116 (2001).

Under these standards, petitioner's presence during the playback of his videotaped confession was not constitutionally required, for it cannot be said that the "fullness of his opportunity to defend" was substantially lessened by his brief (and only assumed) absence. The jury had already viewed the tape during the trial, the playback itself did not occasion any further "defending," and petitioner's counsel was present during the playback. Indeed, replaying the tape in the courtroom was all but indistinguishable from sending the tape into the jury room for

jurors to view on their own, which petitioner concedes would be, like any furnishing to the jury of exhibits already in evidence, a non-material moment for which he need not be present. Petitioner argues, however, that his constitutional rights were violated because, under the circumstances here, the jurors *had* to be returned to the courtroom for the playback. Specifically, during trial, the court had ruled a portion of the tape on which petitioner described other crimes inadmissible. The parties shared a preference to keep the tape intact rather give jurors cause to speculate about the reasons it was altered, and so agreed to elect, as a means of redaction, to have a technician manually turn down the volume during the inadmissible segments. The redaction during playback, of course, could not be effected in this way unless the playback occurred in open court. But the parties' colloquy reveals that manual volume control was not the only available means of redaction, and certainly the playback cannot be rendered into a material stage of the trial merely by the fortuity of the particular means of redaction that the parties happened to have selected.

Although the Constitution did not require petitioner's presence during the playback, prudence most certainly did. It is the rare case in which a defendant's videotaped confession would not be considered an important part of the prosecution's case-in-chief. The request of jurors here to interrupt their deliberations and view the confession again suggests the augmented importance of this particular piece of evidence in this particular trial. Some jurors might have made use of the additional opportunity to observe, simultaneously, both the on- and off-tape demeanor of the accused and draw whatever inferences that comparison might allow. For all these reasons, the proper course of action, unquestionably, was to have had the accused present (and, as a corollary, to have ensured that the record accurately reflect his presence).

In any event, even if petitioner were deprived of a constitutional right to be present at a material stage of his trial, issuance of the writ is not warranted because, in light of the overwhelming evidence of petitioner's guilt, any such error would have been harmless. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (in order to be entitled to habeas relief, petitioner must demonstrate that any constitutional error "had substantial and injurious effect or influence in determining the jury's verdict" and that the error resulted in "actual prejudice"); Rushen v. Spain, 464 U.S. 114, 119 n. 2 (1983) ("violations of the right to be present during all critical stages of the proceedings . . . are subject to harmless error analysis").

The "Murder One" Claim

Petitioner claims that "[t]he prosecution's decision to proceed on a murder in the first degree indictment 'death optioned' was motivated by an intention to retaliate against [petitioner] for exercising his constitutional rights to be free from coercion." Petition, Ground One. The indictment, however, charged petitioner with second-degree murder, and there is nothing in the record corroborating petitioner's apparent belief that the prosecution proceeded on a first-degree murder charge against him.

The "Conspiratorial Bias" Bundle of Claims

Petitioner claims that his conviction was the result of a conspiracy involving the trial judge, whom he claims was biased against him and his counsel, and that the conspiratorial bias was manifest in several adverse rulings of the trial court, including the denial of his request to subpoena Bronx detectives to testify at his pre-trial hearing, the denial of his request to reopen

the Huntley hearing to address Dunaway issues, and a bias-motivated dismissal of his attorney on the first day of trial (the "conspiracy claim"). Petitioner did not pursue the conspiracy claim or any of its discrete branches on direct appeal, so the claim is unexhausted. Because this claim is based on the trial record, however, it would be futile for petitioner to raise it in a 440 motion to vacate in state court. See C.P.L. §440.10 ("the court must deny" such a motion when "sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's . . . unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him"). Since no remaining avenue exists in which petitioner could raise this claim, the Court deems it exhausted but procedurally defaulted. See Coleman v. Thompson, 501 U.S. 722 (1991); Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001). Therefore, this Court may review this claim only if petitioner demonstrates cause for the default and resulting prejudice or that the failure of the Court to review the claim will result in a "fundamental miscarriage of justice," i.e., that he is innocent. Coleman, 501 U.S. at 748-50.

To establish "cause" sufficient to excuse a procedural default, petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule. Coleman, 501 U.S. at 753; Restrepo v. Kelly, 178 F.3d 634, 639 (2d Cir.1999). In an attempt to establish cause for the procedural default, petitioner argues that his appellate counsel was ineffective for failing to raise the claim on his direct appeal. Counsel's alleged ineffectiveness in failing to properly preserve a claim for review in state court can suffice to establish cause for a procedural default, but only when the counsel's alleged ineptitude rises to the level of a violation

of a defendant's Sixth Amendment right to counsel. Edwards v. Carpenter, 529 U.S. 446, 451 (2000). "In other words, ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim." Edwards, 529 U.S. at 451. That claim, therefore, must also be exhausted. Id.

Here, petitioner raised an ineffective assistance of appellate counsel claim (for failing to raise the conspiracy claim and its several branches) in an application for a writ of error *coram nobis* in the Appellate Division, which was denied. People v. Talbert, 14 A.D.3d 627 (2d Dep't 2005). Respondent argues that the appellate ineffectiveness claim has not been exhausted because petitioner failed to seek leave to appeal the denial of his *coram nobis*, but the record reflects that petitioner did make the appropriate leave application, which the Court of Appeals denied on October 30, 2006. See Petitioner's Appendix at A-75. Thus the ineffectiveness claim is exhausted.

The Appellate Division's denial of that claim, however, is not contrary to or an unreasonable application of controlling federal law. See Strickland v. Washington, 466 U.S. 668 (1984). Under the Strickland standard, "[a]ssigned appellate defense counsel is not required to raise every non-frivolous issue on appeal as requested by a defendant." Sellan v. Kulhman, 261 F.3d 303, 317 (2d Cir. 2001) (*citing* Jones v. Barnes, 463 U.S. 745, 751-52 (1983)). Indeed, "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (internal citation omitted).

The *coram nobis* court's citing of Jones v. Barnes shows it was aware of the controlling standard. That court also had before it the detailed affirmation of assigned appellate counsel

John Gemmill explaining the basis for his decision not to raise the conspiracy claim and its several branches. Among other things, Mr. Gemmill explains that (i) with respect to two of his allegations, petitioner was confusing this prosecution with his *other* then-pending indictment; (ii) trial counsel's mere "assertion[s]" were, in his view, "clearly insufficient" to challenge probable cause for arrest (and thus warrant a <u>Dunaway</u> hearing); and (iii) there was no support in the record for the other issues petitioner wished to raise (including Double Jeopardy, <u>Brady</u>, and the concurrence of his sentences). <u>See</u> Gemill Affirmation, dated December 8, 2004 at pp. 4-7 (Respondent's Exhibit F). Furthermore, in his *coram nobis* petitioner also faults Mr. Gemmill because he *did* argue that petitioner was denied his right to be present during the playback of the videotaped confession—an argument that petitioner presses here zealously, but which he described in his *coram nobis* as an issue of no validity.

In light of the foregoing, the Court cannot say that it was an "unreasonable application" of <u>Strickland</u> for the Appellate Division to resolve petitioner's ineffective assistance of appellate counsel claim against him. *That* claim being tendered here as "cause" for the default of the conspiracy claim, the Court therefore concludes that the conspiracy claim and its several branches are procedurally barred from habeas review. <u>Edwards</u>, 529 U.S. at 452-53; <u>Coleman</u>, 501 U.S. at 748.

In any event, each of the substantive branches of the conspiracy claim is meritless. First, the court did not act contrary to or unreasonably apply Supreme Court law when denying petitioner's request to subpoena officers from the Bronx to testify at his suppression hearing; although petitioner apparently sought the Bronx testimony to "complete the picture" of his custodial experience, <u>see</u> T. 152, the fact of his having been in custody for a period of time

-13-

before custody began in Brooklyn did come out in the testimony at trial, T. 70, and there is no dispute that the Bronx officers were not present when petitioner made his statements in Brooklyn. In any event, the claim upon which petitioner argues that the Bronx officers' testimony would have had some bearing—the voluntariness of his Miranda waiver and his subsequent statement—is not before this Court.[4]

Second, the hearing court's denial of petitioner's request to re-open the Huntley hearing to address Dunaway (i.e. Fourth Amendment) issues is not reviewable here. Stone v. Powell, 428 U.S. 465, 482 (1976). To the extent petitioner was seeking to pursue the alternative theory that his statements in Brooklyn should be suppressed as the fruit of an arrest made without probable cause, the hearing court's determination that petitioner had not proffered facts sufficient to warrant a hearing does not amount to an "unconscionable breakdown in the existing process" that would allow habeas review of a Fourth Amendment claim. Capellan v. Riley, 975 F.2d 67, 70 (2d Cir.1992) (internal citations omitted).

Turning, finally, to petitioner's claim that the court, motivated by bias, dismissed his attorney on the first day of trial, the record reveals a substantially different course of events. Although petitioner's initial counsel, Ms. Elizabeth Birkett, apparently did seek the recusal of the hearing court on the grounds that, in a prior matter, the court had made sexist and demeaning remarks to her and trivialized her role as lead counsel, and that in this matter the court was interfering with her representation of her client, petitioner is mistaken in asserting that, because of these apparent differences, Ms. Birkett was dismissed as defense counsel on the first day of trial. Instead, the record shows that, on July 13, 2000, when trial was scheduled to begin, the

---

[4] See note 2.

trial court engaged in an extensive colloquy with Ms. Birkett's husband and law partner, Peter Birkett, concerning Ms. Birkett's apparently serious illness (and thus unavailability). Mr. Birkett explained that the case was his wife's, not his, and that he was not then prepared to try it. Given the seriousness of the charges, the prosecution joined in Mr. Birkett's request, which the court granted, to declare a mistrial and discharge the jury. A second trial commenced three months later, on October 10, 2000. A different justice of the state court presided over this second trial, where petitioner was represented by Peter Birkett. Petitioner expressed neither at trial nor here any reservations about the fact or quality of Mr. Birkett's representation.[5]

Perhaps the origins of petitioner's assertions of judicial "bias" can be found in a brief remark made by the hearing court. While the Rodriguez confession was being played and all three counsel were arguing that their clients' confessions should be suppressed, the court found it necessary to comment as follows:

> Counsel, take a look at your clients for a minute. I just wish to make a record. From my vantage point while I'm watching the videotape, each of your clients, all of them, had their arms around each other, were conversing amongst themselves, were smiling and laughing while the proceedings were continuing. T. 64

When petitioner interrupted to insist that he was not smiling or laughing, the court continued:

> I'm making a record of my observances here of what appears to be a very congenial and apparently a social setting on three defendants faced with Murder 2 charges, something I find absolutely astounding . . . I suggest you take your arms from around each other and pay attention to your cases and leave your socializing for some other time. T. 65.

---

[5] The Court has not been furnished with a copy of the recusal motion of Ms. Birkett or with transcripts of the proceedings relating to it, but the affirmation of appellate counsel attests to those events. The account of the ensuing colloquy concerning Ms. Birkett's illness, however, is drawn from the transcripts.

Of course the hearing court was not expressing bias, but only revealing its sensitivity to the defendants' apparent lack of sensitivity to the brutality of their crime which, in light of the young ages of Rodriguez and Johnson and the distorted brand of leadership offered by petitioner as the adult in their lives, is the corollary tragedy of this case.

## CONCLUSION

For the foregoing reasons, the application is denied and the petition is dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
October 22, 2008

s/ Judge Raymond J. Dearie
_____
RAYMOND J. DEARIE
United States District Judge